IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.                                                    Criminal No.:  ELH-19-0280

JAMAL RINGGOLD,
        Defendant.

**MEMORANDUM OPINION**

Jamal Ringgold, who is self-represented, entered a plea of guilty in January 2020 to one count of conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 846.  ECF 135.  In August 2020, he was sentenced to 60 months of imprisonment.  ECF 234.  He is currently serving his sentence at FCI Schuylkill.  ECF 359 at 3.

Ringgold has filed a motion for compassionate release (ECF 343, the "Motion").  The Office of the Federal Public Defender has advised the Court that it does not intend to supplement Ringgold's pro se filing.  ECF 362.  The government opposes the Motion (ECF 359, the "Opposition"), accompanied by three exhibits. ECF 359-1 to ECF 359-3.  Ringgold has not replied, and the time to do so has passed.

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall deny the Motion.

## I.  Background

In a five-count Superseding Indictment filed on July 10, 2019 (ECF 21), Ringgold, along with codefendants Jebriel Ali, John Paul Jones, Eddie Mack Moore, Rayshawn Roberts, and Marquis Weaver, were charged with one count of conspiracy to distribute and possess with intent

to distribute heroin and cocaine, in violation of 21 U.S.C. § 846 (Count One). *Id* at 2.[1]  Ali was the only person charged in the four other counts. *Id.* at 1-6.[2]  With respect to Ringgold, the amount involved in the conspiracy attributable to him, as a result of his own conduct as well as the conduct of coconspirators that was reasonably foreseeable to him, was 100 grams or more of a substance containing a detectable amount of heroin.  *Id* at 2. Then, on December 11, 2019, the defendants were charged in a six-count Second Superseding Indictment.  ECF 124.  It added Count Six, charging Weaver with possession of a firearm and ammunition by a prohibited person. *Id.* at 7.

Pursuant to a Plea Agreement (ECF 135), on February 3, 2020, Ringgold entered a guilty plea to Count One of the Superseding Indictment.  ECF 134.  The Plea Agreement contemplated a base offense level of 24, based on the combined weight of heroin and cocaine attributable to the conspiracy and reasonably foreseeable to the defendant, per § 2D1.1 of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"). ECF 135, ¶ 6(a). The government reserved the right to seek an increase of up to three levels, based on an aggravating role, pursuant to U.S.S.G. § 3B1.1, and the defendant reserved the right to oppose any such adjustment. *Id.* There was no agreement as to the defendant's criminal history. *Id.* ¶ 6(b).

The Plea Agreement contained a stipulation of facts. *Id.* at 10-11.  According to the factual stipulation, defendant conspired to distribute heroin, fentanyl, and cocaine. ECF 135 at 10. In or about August 2018, the Federal Bureau of Investigation and the Baltimore Police Department began an investigation of multiple drug traffickers operating in and around Baltimore, and

---

[1] A Criminal Complaint was filed against Ali on May 22, 2019.  ECF 1. Ali was indicted on June 5, 2019.  ECF 10.

[2] Count Two charged Ali with possession with intent to distribute narcotics. ECF 21 at 3. Count Three charged Ali with possession of a firearm in furtherance of a drug trafficking crime. *Id.* at 4. In Count Four and Count Five, Ali was charged with possession of a firearm and ammunition by a prohibited person. *Id.* at 5-6.

conducted court-authorized wiretaps. *Id.* The investigators identified Ali as the leader of a drug trafficking organization (the "DTO") in which defendant was a participant. The DTO operated at the intersection of Frederick Avenue and Collins Avenue in Baltimore, in an area known as the "Irvington Community." *Id.* The DTO was responsible for the distribution of at least one kilogram of heroin, a detectable amount of cocaine, and at least 400 grams of fentanyl. *Id.*

Some examples of defendant's participation in the conspiracy included engaging in numerous phone calls and other electronic communications with other members of the DTO during which drug transactions were discussed. *Id.* Defendant knew the conspiracy would distribute at least 1000 grams of heroin and at least 50 grams of cocaine base. *Id.*

Defendant was arrested on the charges at Baltimore Washington International Airport on July 12, 2019. ECF 227 (Defendant's Sentencing Memorandum) at 4. He was released on May 5, 2020, pending sentencing, because of his risk of severe symptoms of COVID-19 due to his asthma. *Id.*

Sentencing was held on August 20, 2020. ECF 233. The initial Presentence Report (ECF 168) included a two-level enhancement under § 3B1.1 based on role in the offense. However, it was amended on August 20, 2020. ECF 237 (Amended Presentence Report or "PSR"). As amended, the PSR did not include a role enhancement. The PSR contemplated a base offense level of 24. *Id.* ¶ 22. After three deductions for acceptance of responsibility, the defendant had a final offense level of 21. *Id.* ¶¶ 24-26.

The PSR identified several of defendant's prior criminal convictions in Maryland state courts. *Id.* ¶¶ 29-36. These convictions yielded a subtotal of four criminal history points. *Id.* ¶ 37.[3] In addition, the PSR noted that, at the time of the instant offense, defendant was "under

---

[3] Not all of these convictions scored points.

probation supervision in multiple cases." ECF 237, ¶ 38. These cases appear to include his conviction for possession with intent to distribute and his conviction for attempt to elude a uniformed police officer. *See id.* ¶¶ 31, 36.  As a result, two criminal history points were added, for a total of six points.  *Id.* ¶ 38.  This yielded a criminal history category of III.  *Id.* ¶ 39.

In particular, on multiple occasions between 2014 and 2017, defendant was convicted of driving a motor vehicle on a highway without the required license and authorization. *Id.* ¶¶ 29-34. These convictions did not result in a sentence of more than 60 days' incarceration. *Id.* ¶¶ 29-34. And, on June 16, 2015, defendant was convicted in the Circuit Court for Baltimore City of possession with intent to distribute narcotics.  He received a sentence of probation before judgment, subsequently violated his probation, and then received a suspended two-year sentence. *Id.* ¶ 31.  On July 30, 2018, defendant was convicted of unlawful possession of a controlled dangerous substance.  *Id.* ¶ 35; *see* ECF 230 at 2-3.  On May 29, 2019, defendant was convicted of attempting to elude a uniformed police officer while driving. ECF  237, ¶ 36. Defendant was sentenced to one year of incarceration, with all but three days suspended. *Id.*

Based upon defendant's total offense level and criminal history category, the advisory sentencing guidelines called for a period of incarceration ranging from 46 to 57 months. *Id.* ¶ 65. However, given the mandatory minimum sentence of 60 months, the Guidelines range was adjusted to 60 months.  *Id.*; *see* U.S.S.G. § 5G1.1(b).

Defendant was 25 years old at the time of sentencing.  ECF 237 at 3.  He graduated from Edmondson High School and took classes in 2013 at the Community College of Baltimore County at Catonsville. ECF 237, ¶¶ 57-59.  At the time of sentencing, defendant was engaged, and the father of two young boys, who were then five years old and one year of age. *Id.* ¶¶ 49-50; *see also* ECF 343 (asserting that defendant is still engaged).

- 4 -

At the age of thirteen, Ringgold began using marijuana daily. ECF 237, ¶ 55. By the age of twenty, defendant began using oxycodone daily, in addition to marijuana. *Id.* He subsequently became addicted to heroin and suboxone. *Id.* Since Ringgold's arrest in this case in July 2019, he participated in a few drug treatment classes. *Id.* ¶ 56.

As noted, I imposed a total sentence of 60 months' imprisonment, with credit for time served from July 12, 2019, through May 5, 2020, as well as four years of supervised release. ECF 234 (Judgment). I also recommended that defendant participate in a substance abuse program, including the Residential Drug Abuse Program at the Bureau of Prisons ("BOP"). *Id.*

The defendant is currently inarcerated at FCI Schuylkill. ECF 359 at 3. The BOP indicates a projected release date for Ringgold of April 26, 2024.  *Id.*; *see also* Inmate Locator, BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited Mar. 15, 2022).  Given the credit defendant received for his time in custody since July 2019, Ringgold has served about 28 months of his 60-month sentence, or approximately 47%. Notably, the government's Opposition makes no mention of any disciplinary actions against defendant during his incarceration. *See* ECF 359.

Ringgold represents that he "has a family that he is constantly in contact with." ECF 343 at 2. Further, he represents that if he is released, he will reside with his mother, and a job is waiting for him at his father's barbershop.

## II. Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Hargrove*, ___ F.4th ___, 2022 WL 905436, at *3 (4th Cir. Mar. 29, 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*,

564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."  18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence, if "extraordinary and compelling reasons warrant such a reduction."  18 U.S.C. § 3582(c)(1)(A)(i); *see Hargrove*, 2022 WL 905436, at *3.  This provision is an exception to the ordinary rule of finality.  *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).

Section 3582 was enacted as part of the Sentencing Reform Act of 1984.  Originally, it permitted a court to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 Fed. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying  compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress passed the First Step Act of 2018 ("2018 FSA" or "First Step Act"), Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020).  As amended by the 2018 FSA, 18 U.S.C. § 3582(c)(1)(A) now permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion*

*of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  (Emphasis added).  So, once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, he or she may petition a court directly for compassionate release.  *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276.  That option constitutes a sea change in the law.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) [of 18 U.S.C.] to the extent that they are applicable," it finds that

(i) extraordinary and compelling reasons warrant such a reduction; or

(ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

*See United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam); *see also Hargrove*, 2022 WL 905436, at *3; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021).

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.  Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the

'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276.  Moreover, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169.

The Fourth Circuit has said that, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 Fed. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).  In U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might merit compassionate release.  *See McCoy,* 981 F.3d at 276-77.[4]

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive, and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons."  U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the

_____

[4] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C).  *See McCoy,* 981 F.3d at 276.

reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13 App. Note 1(D).  This is the "so-called, 'catch-all' category."  *McCoy*, 981 F.3d at 276.

However, as the *McCoy* Court recognized, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the First Step Act.  *McCoy*, 981 F.3d at 276.  Of significance here, it is only "directed at BOP requests for sentence reductions." *Id.* (citing U.S.S.G. § 1B1.13).  "By its plain terms, in short, § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)."  *Id.* at 282; *see also Jenkins*, 22 F.4th at 169; *United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).  In other words, the policy statement does not apply to the court.

Indeed, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction."  *McCoy*, 981 F.3d at 283; *see also Hargrove*, 2022 WL 905436, at *3-4.  Consequently, district courts are "'empowered…to consider any extraordinary and compelling reason for release that a defendant might raise.'" *Id.* at 284 (quoting *Zullo*, 976 F.3d at 230); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily summarized."  *Hargrove*, 2022 WL 905436, at *6.  But, "rehabilitation alone cannot serve as a basis for compassionate release."  *United States v. Davis*, ___ F. App'x ___, 2022 WL 127900, at * 1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *United States v. Harris*, ___ F. App'x ___, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam); 28 U.S.C. § 994(t).

However, "successful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons. *Harris*, 2022 WL 636627, at *1.

The Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c). *Jenkins*, 22 F.4th at 169.  However, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction." *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187.  Although there are currently no applicable policy statements for the Sentencing Commission that are applicable to compassionate release, U.S.S.G. § 1B1.13 "remains helpful guidance . . . ."  *McCoy*, 981 F.3d at 282 n.7; *see Hargrove*, 2022 WL 905436, at *3.

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020).  And, even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, the court must consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *Hargrove*, 2022 WL 905436, at *4; *High*, 997 F.3d at 186; *see also United States v. Butts*, No. 21-6380, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 Fed. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to

reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors); *United States v. Spriggs*, CCB-10-0364, 2021 WL 1856667, at *3 (D. Md. May 10, 2021) (court must consider the § 3553(a) factors).

As mentioned, the district court is "'empowered . . . to consider *any* extraordinary and compelling reason for release'" raised by a defendant. *McCoy*, 981 F.3d at 284 (citation omitted); *see Jenkins*, 22 F.4th at 169. Nevertheless, compassionate release is a "rare" remedy. *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020). And, "[a] district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*, ___ U.S. ___, 138 S. Ct. 1959 (2018) (passim); *High*, 997 F.3d at 187. Moreover, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted).

### III.  COVID-19[5]

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020. *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[6] Defendant filed his

---

[5] The Court may take judicial notice of matters of public record. *See* Fed. R. Evid. 201.

[6] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19. *See Naming the Coronavirus Disease*

motion for compassionate release in September 2021.  ECF 343.  At the time, the nation was still "in the grip of a public health crisis more severe than any seen for a hundred years."  *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020).

The judges of this Court "have written extensively about the pandemic."  *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of it.  *Id.*

That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it."  *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 Fed. App'x 978 (6th Cir. 2020). For a significant period of time, life as we have known it came to a halt.  For quite some time, businesses and schools were shuttered or operated on a limited basis, in an effort to thwart the spread of the virus, which is highly contagious.  *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, Ctrs. for Disease Control & Prevention (Apr. 2, 2020), https://bit.ly/2XoiDDh.  The judiciary, too, faced many operational challenges.

People who are stricken with the virus sometimes experience only mild or moderate symptoms.  But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ."  *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

---

*and the Virus that Causes It*, World Health Org., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

As of April 4, 2022, COVID-19 has infected more than 80 million Americans and caused approximately 982,000 deaths in this country.  *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed Apr. 4, 2022).

For a brief time, this country enjoyed a reduction of COVID-19 cases.  In the fall of 2021, the trend seemed favorable.  *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021,   https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html   ("The number of new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region.").  But, the trend was short-lived, due to the spread of the Delta variant. *See* Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August 14, 2021, "[i]nfections have spiked to the highest levels in six months").  Indeed, the Delta variant was thought to be more virulent and capable of causing more severe illness than were earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants");   *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show.").

Then, the Omicron variant emerged, both around the world and in the United States, which sparked further cause for concern. It, too, is highly contagious. *See Omicron Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13, 2021). Indeed, Omicron contributed to a substantial and serious spike in COVID-19 cases. *See, e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN (Dec. 31, 2021), https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html.

Recently, however, the number of COVID-19 cases has declined considerably. *See, e.g.*, Anabelle Timsit, *U.S. coronavirus cases are dropping. Other countries are breaking records.*, WASH. POST (Feb. 7, 2022), https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-variant-live-updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y. The country is generally returning to some normalcy.

Nevertheless, and of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus. But, the Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive." *Hargrove*, 2022 WL 905436, at *4. In other words, there is no bright-line rule predicated only on the CDC's identification of certain health conditions in the "highest risk category." *Id.* at *5.

The risk factors initially identified by the CDC included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16. But, the CDC has repeatedly revised its guidance as to medical conditions

- 14 -

that pose a greater risk of severe illness due to COVID-19.   In February 2022, it updated its guidance to reflect the most available data.  *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Feb. 25, 2022), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities, such as Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the body mass index ("BMI") is 25 or higher; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis.  *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.  *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.  Furthermore, "[t]he risk of severe COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*.

To stem the spread of the virus, people have been urged to practice "social distancing" and to wear masks.  *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020).  However, social distancing is particularly difficult in the penal setting.  *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM

(June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area."). Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high."). Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020). And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from

approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."[7]

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP. The DOJ adopted the position that an inmate

---

[7] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020) (On October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems." *America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9. Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

On May 8, 2020, two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum to implement the Attorney General's directives on the increased use of home confinement. The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

Although there is currently no cure for the virus, medical treatments have continued to improve. And, significantly, we have seen the rollout of three vaccines for COVID-19 (Pfizer,

- 18 -

Moderna, and Johnson & Johnson).[8] Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has since been approved for all persons five years of age and older.  *See* Cheyenne Haslett, *FDA Authorizes COVID-19 Vaccine for Kids 5-11*, ABC NEWS, Oct. 29, 2021, https://abcnews.go.com/Politics/fda-authorizes-covid-19-vaccine-kids-11/story?id=80846188. Approximately 65% of the total U.S. population is fully vaccinated, including 28% of people from ages 5 to 11, 59% of people from ages 12 to 17, 72% of people from ages 18 to 64, and 89% of people age 65 and up.  *See How Vaccinations Are Going in Your County and State*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last visited Apr. 4, 2022).

Moreover, roughly 97.8 million Americans have received a third or "booster" vaccine dose, which the CDC recommends for all persons age 18 and older.  *See id*.; *COVID-19 Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last updated Mar. 31, 2022).  And, federal regulators have recently approved a second booster dose for individuals age 50 and older.  *See* Cheyenne Haslett and Eric M. Strauss, *Officials say everyone over 50 can get a 4th COVID shot, but 'especially important' for higher risk people*, ABC NEWS (Mar. 29, 2022), https://abcnews.go.com/Health/4th-covid-shot-authorized-fda-50/story?id=83730999.

---

[8] Questions as to the efficacy of the Johnson & Johnson vaccine were raised as to the Delta and Omicron variants. *See J&J, Sinopharm, Sputnik V COVID-19 shots less effective against Omicron -study*, REUTERS (Dec. 17, 2021), https://www.reuters.com/business/healthcare-pharmaceuticals/jj-sinopharm-sputnik-v-shots-weaker-against-omicron-study-shows-2021-12-17/; Apoorva Mandavilli, *J.&J. Vaccine May Be Less Effective Against Delta, Study Suggests*, N.Y. TIMES (July 20, 2021), https://www.nytimes.com/2021/07/20/health/coronavirus-johnson-vaccine-delta.html.

Given the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4.  Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. As of April 4, 2022, the BOP had 135,398 federal inmates and approximately 36,000 staff. And, by that date, the BOP had administered 309,488 vaccine doses to staff and inmates. *See* https://www.bop.gov/coronavirus/ (last accessed Apr. 4, 2022).

As of April 4, 2022, the BOP reported that 118 federal inmates, out of a total population of 135,398, and 140 BOP staff, out of some 36,000 staff members, currently test positive for COVID-19.  Moreover, 53,485 inmates and 12,532 staff have recovered from the virus.  And, 292 inmates and seven staff members have died from the virus.  The BOP has completed 128,823 COVID-19 tests.  *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to FCI Schuylkill, where the defendant is imprisoned, the BOP reported that as of April 4, 2022, out of a total of 1,089 inmates, zero inmates and three staff have tested positive, zero inmates have died of COVID-19, and 524 inmates and 73 staff have recovered at the facility. In addition, 169 staff members and 1,124 inmates at the FCI Schuylkill complex have been

- 20 -

inoculated with the vaccine.  *See* https://www.bop.gov/coronavirus/, Federal Bureau of Prisons,

https://www.bop.gov/locations/institutions/sch/ (last visited Apr. 4, 2022).

## IV. Discussion

### A. Exhaustion

The government contests that defendant has satisfied the exhaustion requirements of the

compassionate release statute. ECF 359 at 7. As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A)

permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of

[BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative

rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of

30 days from the receipt of such a request by the warden of the defendant's facility," whichever

occurs first.  So, once a defendant has exhausted his administrative remedies, he may petition a

court directly for compassionate release.  *See, e.g.*, *Jenkins*, 22 F.4th at 169 ("Congress enacted

the First Step Act to allow incarcerated individuals to directly petition district courts for

compassionate release so long as they first exhaust their administrative remedies.").

In *Muhammad*, 16 F.4th 126, the Fourth Circuit made clear that, under a plain reading of

the statute, a defendant need only wait until the 30 days have passed from receipt of his

compassionate release request by the warden to directly petition the court.  *Id.* at 129.  "The text

of § 3582(c)(1)(A) plainly provides that a defendant may file a motion on his own behalf 30 days

after the warden receives his request, regardless of whether the defendant exhausted his

administrative remedies."  *Id.*  Thus, the term administrative "exhaustion," although commonly

used, may to some extent be a misnomer.  In any case, the statute is clear that a defendant must

have, at the very least, directed a compassionate release request to the warden before filing such a

request in court.  *See McCoy*, 981 F.3d at 276 (noting that "defendants now may file motions for

- 21 -

sentence modifications on their own behalf, *so long as they first apply to the BOP*.") (emphasis added).

The Fourth Circuit also clarified in *Muhammad*, 16 F.4th at 130, that this administrative requirement "is a non-jurisdictional claim-processing rule," rather than a jurisdictional provision. This means that it can be "waived if it is not timely raised." *Id*. at 129.  Here, however, the government has raised it.

In the Motion, Ringgold asserts that he has "exhausted his Administrative Remedies with the warden." ECF 343 at 1. However, he has not provided any details or supporting documentation as to exhaustion. Although the government disputes that Ringgold has exhausted all administrative requirements (ECF 359 at 7), it does not provide any documentation to support this assertion. Rather, it merely states: "Defendant has failed to follow the necessary protocols as required under § 3582, and by failing to do so, he has not exhausted the administrative remedies available to him by seeking relief from the warden." *Id.* at 9.[9]

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See, e.g.*, *Hamilton*, 715 F.3d at 337; *Edwards*, 2020 WL 1650406, at *3.  Notably, Ringgold has not replied to refute the government's allegations.

I conclude that defendant has not satisfied the threshold requirement that he first direct a compassionate release request to the warden before seeking relief in court.

---

[9] The notice by the FPD, advising that it would not be representing Ringgold in this matter, states: "[T]he Federal Public Defender has not received any documents regarding Mr. Ringgold's exhaustion of administrative remedies." ECF 362.

**B. Merits**

Even if Ringgold has satisfied his administrative exhaustion requirements, his claim would fail on the merits. This is because Ringgold has failed to establish extraordinary and compelling circumstances under the compassionate release statute.

As noted, compassionate release is a "rare" remedy. *White*, 378 F. Supp. 3d at 787. Ringgold has presented several reasons as to why he should be released early. But, none of them justify an alteration of Ringgold's sentence.

Ringgold's primary argument is based around the risk of his contracting COVID-19. *See* ECF 343 at 1-2. Defendant asserts that although he does not presently have the COVID-19 virus, he does not want to get infected with it and potentially die. *See id.* Ringgold argues that this fear of contracting COVID-19, by itself, should constitute an extraordinary and compelling reason sufficient to warrant his release. *See id.*

Defendant provides no information, however, to suggest that he has any particular health condition putting him at increased risk as a result of COVID-19, so as to form the basis for compassionate release. Additionally, defendant just turned 26 years of age, indicating that his age is not a risk factor, according to the CDC. *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.

Ringgold also provides no evidence to demonstrate why inmates at FCI Schuylkill are at a heightened risk of contracting COVID-19. As of March 21, 2022, the BOP reported that out of a total of 1,063 inmates at FCI Schuylkill, no one has tested positive, no inmates have died of COVID-19, and 527 inmates and 73 staff have recovered at the facility. *See* https://www.bop.gov/coronavirus/,                Federal        Bureau        of        Prisons,

https://www.bop.gov/locations/institutions/mcr/ (last visited Mar. 22, 2022). In addition, 169 staff members and 1,069 inmates at FCI Schuylkill complex have been inoculated with the vaccine. *Id.* Therefore, the spread of COVID-19 at Ringgold's facility appears to be under control, at least for the time being.

Fear of COVID-19, without the presence of additional factors, does not constitute an extraordinary and compelling circumstance that warrant's an inmate's release. Judge Chasanow of this Court has explained: "While all share the concern of the public health challenges caused by COVID-19, and appreciate the heightened anxiety experienced by those incarcerated in correctional facilities . . ., generalized and unspecific reasons . . . do not satisfy the standard for compassionate release." *United States v. Harris*, DKC-08-319, 2020 WL 2512420, at *1 (D. Md. May 15, 2020).

However, I am mindful that defendant was released from pretrial detention on May 5, 2020, pending sentencing, due to his increased risk of severe COVID-19 symptoms because of his asthma condition. *See* ECF 227 at 4. Asthma is also indicated in defendant's BOP medical records. ECF 359-3 at 15, 48. But, the Motion makes no mention of asthma, nor any other medical condition that might trigger a compelling circumstance warranting release. *See* ECF 343.

With regard to asthma, the CDC is clear that people with "moderate-to-severe or uncontrolled asthma are more likely to be hospitalized from COVID-19." *People with Moderate to Severe Asthma*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html (last updated Apr. 7, 2021). But it is unclear from the record whether Ringgold's asthma qualifies as "moderate to severe."

Rulings as to the significance of asthma are mixed. Judge Grimm has noted: "This Court and others have found that the standard of extraordinary and compelling reasons was met during the COVID-19 pandemic where a defendant had a risk of serious complications from COVID-19 based on asthma and other medical conditions …. However, in some cases this Court and others have found that mild asthma alone did not constitute extraordinary and compelling reasons for release." *United States v. Jennings*, PWG-13-046, 2020 WL 4748462, at *4 (D. Md. Aug. 17, 2020) (collecting cases).

Similarly, another court has remarked: "Because the CDC lists moderate to severe asthma as a condition that can increase the risk of severe illness caused by COVID-19, many courts have distinguished between petitioners with mild/moderate asthma to severe asthma when deciding whether the condition constitutes a compelling and extraordinary circumstance justifying compassionate release….Moderate asthma occurs 'where the individual suffers from daily symptoms, experiences nighttime awakenings more than once a week, uses an Albuterol rescue inhaler on a daily basis, and experiences some limitation of normal activities.'" *United States v. Garcia*, 538 F. Supp. 3d 226, 228 (D. Mass. 2021) (internal citations omitted). *See also*, e.g., *United States v. Armstrong*, RDB-19-357, 2021 WL 2806226, at *3 (D. Md. July 6, 2021) (citing CDC guidance, declining to find extraordinary and compelling reasons based on asthma adequately managed by prescriptions; *United States v. Malone*, CCB-13-307, 2021 WL 252559, at *1 (D. Md. Jan. 26, 2021) (asthma alone not sufficient grounds for compassionate release); *United States v. Daniels*, Crim. No. 15-127, 2020 WL 4674125, at *3 (E.D. Pa. Aug. 12, 2020) (recognizing that moderate to severe asthma could constitute an extraordinary and compelling reason for compassionate release, but concluding it was not warranted based on medical records

indicating asthma is under control; defendant was instructed to use Albuterol only to prevent attack, but not daily).

Based on defendant's BOP medical records, Ringgold's asthma condition seems to fall in the mild category, which would not support a finding of extraordinary and compelling circumstances to warrant compassionate release. The record indicates that Ringgold "reports asthma since childhood, used albuterol inhaler 3-4 times per week." ECF 359-3 at 15, 48.[10]  But, he was never hospitalized for the condition. *Id.* There is no evidence that Ringgold suffers from daily symptoms, uses an Albuterol inhaler on a daily basis, or experiences any other limitation of normal activities that would suggest his condition rises to the level of moderate or severe. *See id.* To the contrary, his asthma appears to be controlled. Indeed, Ringgold does not even mention his asthma in his Motion.

Given Ringgold's youth and apparent good health; the fact that he has invoked no health conditions in the Motion; the seemingly mild nature of his asthma; the limited spread of the virus in FCI Schuylkill; and the availability of effective COVID-19 vaccines, which defendant himself has received (*see* ECF 359-4), I am of the view that defendant has failed to establish an extraordinary and compelling reason on the basis of health.

Ringgold also cites his efforts at rehabilitation as a basis for finding extraordinary and compelling circumstances. ECF 343 at 2. These include having received several drug education and drug treatment certificates and his GED certificate. *See id.*[11] Defendant asserts that he intends

---

[10] The record is unclear as to exactly when Ringgold used the albuterol inhaler 3-4 times per week, although the use of the word "used" suggests that he no longer uses one at the present time. ECF 359-3 at 15, 48.

[11] It is not entirely clear from the Motion what certificates defendant has received. He mentions receiving his GED. ECF 343 at 2. Based on the record, Ringgold had already received his high school diploma (ECF 237 at 3), so the Court is uncertain as to why defendant would have

to better himself by way of residential drug treatment. *Id.* In addition, Ringgold notes his desire to spend time with his children. *Id.* Ringgold's desire to see his children is eminently understandable. But, it is the same situation faced—regrettably—by a great many incarcerated people, not the "grievous case[]" warranting compassionate relief.  *McCoy*, 981 F.3d at 287.  Defendant also mentions that he has a job waiting for him, a home to stay at upon release, and a lack of a violent history. ECF 343 at 2. Further, he asserts that he is not a threat to the public or himself. *Id.*

Ringgold's rehabilitative work while incarcerated is laudable, as is his desire to spend time with his children.  The Court applauds the strides Ringgold has made.

Notably, the Court must make an "individualized assessment[]," *id*. at 286, which may include such factors as rehabilitation and other post-sentencing conduct, youth, the ill health of a family member, and more.  *Harris*, 2022 WL 636627, at *1; *Davis*, 2022 WL 127900, at *1-2; *McCoy*, 981 F.3d at 286-87.   However, "rehabilitation alone cannot serve as a basis for compassionate release."  *Davis*, 2022 WL 127900, at *1.

Keeping in mind that compassionate release is properly reserved for "the most grievous cases," *McCoy*, 981 F.3d at 287, defendant's arguments do not support a finding of extraordinary and compelling circumstances.

The coronavirus is not "tantamount to a 'get out of jail free' card." *United States v. Williams*, PWG-13-544, 2020 WL 1434130, at *3 (D. Md. Mar. 24, 2020) (Day, M.J.). When a court finds extraordinary and compelling reasons under 18 U.S.C. § 3582(c)(1)(A), it must still consider the factors set forth in 18 U.S.C. § 3553(a) in deciding whether to exercise its discretion in favor of release. *See High*, 997 F.3d at 186; *see also United States v. Butts*, No. 21-6308, 2021

---

received his GED. Ringgold also mentions that he has taken or plans to take a U.S. citizenship test. ECF 343 at 2. But, it appears that defendant is a U.S. citizen.  ECF 237 at 3.

WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam). These factors include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims. *High*, 997 F.3d at 186.

The circumstances cited by Ringgold must be weighed against the severity of his offenses. As noted, Ringgold participated in a conspiracy to distribute heroin, fentanyl, and cocaine. ECF 135 at 10.  He was a part of a DTO that was responsible for the distribution of at least one kilogram of heroin, a detectable amount of cocaine, and at least 400 grams of fentanyl. *Id.* The activities of such a DTO are a serious threat to public health and safety.

For the reasons previously noted, Ringgold does not qualify for release under the § 3553(a) factors. The sentencing factors implicate the consideration of many of the issues already discussed. Ringgold has eight prior criminal convictions of varying severity, and was part of a DTO involving a large quantity of narcotics. *See* ECF 135 at 10. Notably, defendant has also failed to abide by the terms of probation in the past; he was on probation in two cases at the time of the instant offense. ECF 237, ¶ 38. Additionally, defendant has served only 47% of his 60-month sentence, which is the mandatory minimum based on the Guidelines. *See* ECF 359 at 2-3; *see also* ECF 237, ¶ 65. In my view, the relevant factors do not justify granting the Motion.

### V. Conclusion

For the reasons set forth above, I shall deny the Motion, without prejudice.

An Order follows, consistent with this Memorandum Opinion.

Date: April 4, 2022

_____/s/_____
Ellen L. Hollander
United States District Judge